Our fourth case for argument this morning is United States v. Brown v. Tomaga Mr. Camarena Your honors, our police counsel, may it please the court, I am Paul Camarena, I'm the court appointed counsel for the appellant Mary Tolaga. The appellee is represented by very capable counsel, certainly. Nevertheless, I'm concerned that the appellee's responsive brief may have convoluted some issues and I will attempt to disentangle those issues. Mary Tolaga was a medical biller for a physician's group and she was charged with fraudulently overbilling Medicare. During trial, one witness testified that Mary Tolaga stated that the physician's group would have to, quote, trick Medicare. Another trial witness testified that Mary Tolaga confessed. The defense has never argued that the evidence was insufficient to support a finding that Mary Tolaga has participated in her employer's fraud. Even after the district court invited the defense to file post-conviction motions, the evidence was insufficient to support that conviction. If that were our appellate issue, as the appellee's brief suggests, I would have been obligated to file an Anders brief, which I have done dozens of times. The appellate issue is not whether the evidence was sufficient to support a finding that Ms. Tolaga participated in her employer's fraud. In fact, the appellate issue is whether the evidence is sufficient to support the district court's finding that Mary Tolaga participated in her employer's fraud from day one, from the first day that she started working. The reason that's important, Your Honor, is because society, of course, demands that criminal defendants pay for the extent of their crimes. And as this court has pointed out before, the fact that a criminal defendant knew about a conspiracy today on a Tuesday establishes that that criminal defendant was aware of that conspiracy the following day on Wednesday. It doesn't establish that that defendant was aware and participated in that fraud the previous day on Monday. So during the sentencing phase, the defense asked the district court to make a finding about when Ms. Tolaga became aware of her employer's fraud, and thus when she would have become responsible for that fraud. She began working for her employer in 2007, and this fraud continued and ended in 2011. The district court found that Ms. Tolaga necessarily must have known and participated in that fraud from day one, from the very first day that she began working there. And that finding cannot be supported by the record. The government will certainly cite to three facts in the record that one can easily confuse for being sufficient to support a finding that Ms. Tolaga knew about the fraud from day one, from the very first day she started working there. However, when this court more closely examines these facts, the court will see that they actually cannot support that finding. Number one, Medicare of course requires medical billers to make a certification that their physicians have contemporaneously documented the physician's treatments to their patients. And Mary Tolaga made this certification that she had contemporaneous documentations from the physicians, when in fact she knew that she didn't have this documentation. And the district court stated that it was relying on her false certification in order to make a finding that she must have known about the fraud from day one. However, the only evidence with respect to her false certification about this contemporaneous documentation is an email that she wrote in 2010, which was several years after she began working for her employer, and only a few months before she stopped working for that employer. So that email, that evidence cannot support a finding that she must have known about the fraud and participated in that fraud several years earlier. Number two, of course, Ms. Tolaga was charged and convicted of having participated in her employer's fraud of over billing Medicare for medical services that were not medically appropriate. And the district court noted that Ms. Tolaga had some expertise in the medical field even before she began working for this employer. And so the district court stated that she must have known and must have recognized this fraud immediately. And it's absolutely true. Ms. Tolaga did have expertise in the medical field even before she started working for this relevant employer. However, that expertise pertained to medical billing. That expertise did not pertain to medical doctors, appropriate treatments on their patients. And I would ask the court to consider our own field in the legal field. Federal courts often employ lay people who administer the CJA Act. And these lay people, CJA administrators, may develop some vast expertise in legal billing. They become intimately familiar with mileage rates and court reimbursements for expenses and statutory maximums. But one wouldn't expect these lay people, CJA administrators, to immediately recognize if a CJA attorney were inappropriately billing for, example, writing a motion in limine or filing a petition for a writ of certiorari. And Ms. Tolaga was like a CJA administrator, whereas the doctors, the physicians, were like the CJA counsel. So the district court's finding that because she had some expertise in the medical field, cannot support its conclusion that she must have recognized that these doctors were not providing appropriate medical services from day one, especially when her only expertise in the medical field prior to having worked for this employer was having taken an online community college course on medical billing. Number three, and probably most importantly, the district court stated that the numbers just didn't add up, and Ms. Tolaga knew what the numbers were, and the numbers didn't add up because there are only 24 hours in one day. And it's true that Ms. Tolaga billed Medicare for her physicians as having performed more than 24 hours of a particular service called care plan oversight on one particular day. And of course, not even lawyers can work more than 24 hours in a day. However, the evidence established, and it was unrefuted, that the 24 plus hours billed in a day does not represent 24 hours worked in one day. It represents the total amount of hours that had been worked in the month before. I'd ask the court to consider testimony from the government's own witness who was an expert, who represented herself as an expert in Medicare billing. She was asked, when they submit that to you, they submit it to you as having occurred on one particular day. Isn't that right? And she responded, that's how they're submitting it, that's how they're billing it to us, yes. Another witness, a second witness, was asked, with this type of billing, is it possible for a doctor to bill more than 24 hours in one day? And she responded, yes it is, because it doesn't total that day. It totals the entire month's worth of work. Now, that evidence was unrefuted, and not even the government questioned its own witness's testimony. It's very possible that the district court discounted that evidence. The district court, with respect to this issue, was a trier of fact, and it was free to find that evidence not credible. However, one should expect that if the district court were to find that two witnesses, including a government witness, perjured themselves with respect to an issue that had not been refuted, that the district court should make that finding on the record, which the district court didn't do. So the district court's finding that Ms. Medical treatment cannot support its conclusion that she would have known about this fraud immediately, especially given this unrefuted testimony. Your honors, as I started mentioning, society demands that a criminal defendant pay for the extent of their fraud. And Ms. Tulaga was convicted, and she will pay for this conviction for the rest of her life. She has already had to surrender interest in a home in order to begin paying restitution. She has never been accused or charged with a crime before, and she will have to serve a lengthy prison sentence. And even after she completes her prison sentence and she's in her 60s, the government will probably garnish her income in order for her to finish paying restitution. And that's because society demands that she pay for the extent of her crime. However, society shouldn't demand that she pay for more than the extent of her crime. And I'll ask the court to limit- Thank you, counsel. Thank you. Mr. Camarena, you want to remove all your papers, I think. Thank you. Not because I'm short, right? I can see over. Good morning, Judge Easterbrook, Judge Bower, Judge Ripple, may it please the court. My client, Rick Brown, was sentenced to 87 months in prison, a little over seven years. In sentencing him, the judge said there were four reasons. The amount of money involved, the duration of the offense, the fact that the judge thought he did not accept responsibility, and the need for general deterrence. And although the judge didn't, and didn't need to, parse out how much weight for each of those four prongs, he did say very clearly that this was a significant factor. Not the only factor, not the most important factor, but a significant factor. He went on to talk about how health care fraud is endemic in our society. There's a low likelihood of being caught, he said. And therefore, the sentence must be severe to send a signal. He then went on to say that he wholeheartedly, on this point, agreed with the prosecutor, who had said health care fraud is a huge problem. And there's a substantial and overwhelming need to have a lengthy sentence for general deterrence purposes. But the government gave the judge no citations, no specific information other than these blanket assertions about the extent of health care fraud and the importance of general deterrence at sentencing. Even though we know it is the government's burden on these prongs to put forward some evidence, which the government did when it was talking about loss early on in the sentencing. The studies, though, show the opposite. They show that the length of sentence does not deter. Only the certainty or the likelihood of getting caught. Which I think we all intuitively know the idea is, or at least in my experience, somebody will say, well, I never thought I would get caught. I don't hear people saying, well, I weighed whether it was five years or ten years for the sentence. And the studies bear that out, both for street crime and for white-collar crime. In addition- And this court recalled the cost-benefit analysis, but go ahead. Yes, there is a cost-benefit analysis, but I think that cost-benefit analysis goes to whether I'll be caught, not to how long I'm going to go to jail, and that is the difference. The other piece of that is the court said there is a low likelihood of getting convicted, but I never thought I would say this to this court, but the government has done a really fantastic job in prosecuting health care fraud. In 2015 alone, they issued 243 press releases on people getting caught for health care fraud. Now, it's true we don't know the extent of the universe, that's not knowable. But people know that there's a higher likelihood of being caught for health care fraud. The court did not, as the government said, consider and reject these points. The court simply accepted the statements of the government. It doesn't seem to me that just for the record, that a judge does not need any reliable evidence to support the weight of imposing sentence. Seems to me there needs to be something more where every judge in the country can pick a weight at random. Therefore, I ask your honors to please remand this case for resentencing for Mr. Brown. Thank you. Mm-hm, thank you, counsel. Mr. Gingras. Good morning, may we please the court? Kevin Gingras on behalf of the United States. This is a case about fraud about two people, the appellants Brown and Talaga, who lied and cheated the Medicare program in order to take money out of it that they didn't deserve. Neither Brown, who was the practice manager at the company called Medi-Cal, nor Talaga, who billed for Medi-Cal, as they both noted, neither of them challenges any aspect of their conviction, but each raises a separate sentencing claim, and both should be rejected. Unless the court wants me to proceed differently, I'll actually address Mr. Brown first, and then take Miss Talaga second. For Brown, the district court varied downward 34 months from the guidelines range before imposing the sentence, and it was well within its discretion to do so after it correctly calculated the guidelines, and after it had weighed each of the 3553A factors one by one. After going through those factors, including general deterrence, the district court reached its conclusion about the appropriate sentence. Now, with regard to general deterrence, the district court did say, as my friend pointed out, that Medicare fraud was endemic in this country, and that those who are in the medical field who are tempted to engage in this fraud must know that the penalties are severe, and that the sentence needed to send a signal to home health care practitioners in particular. The district court was on firm footing in reaching those conclusions, relying on common sense, which includes the nature of the offense itself. As far as evidence in the record, the nature of the offense was the whole point of the trial. The district court could see and confirm what I'm sure it had already understood about white collar crime, the lucrative nature of white collar crime, the difficulty in detecting it, and in particular, in the health care industry. And of course, this court has stated in previous cases that those common sense conclusions are completely appropriate when dealing with general deterrence in the context of white collar crime. So what the district court did here is exactly what you would want any district court to do, which in using its common sense, it weighed the 3553A factors, including the nature of the offense, the history and characteristics of the defendant, and then measuring that against, among other things, the need for general deterrence in these cases. With regard to Ms. Talaga, the district court, I think, did not clearly err in concluding that she was responsible or began participating in the conspiracy from the outset of her employment. And gave a number of reasons at sentencing, but there are also a number of reasons, and there's also evidence within the trial record that would support a finding that the district court did not clearly err in this instance. At sentencing, the district court pointed to a number of facts, including her education and training as a biller, but also common sense and the idea of the hours adding up, which my friend Mr. Camarena addressed and I will untangle in some detail just to make it clear. With regard to her education, Ms. Talaga, the record indicated and the court relied on the fact that she was a seasoned biller from the outset. She took a number of courses that were geared toward preparing her for becoming a medical biller and coder, and this included training on the same billing software that the company was using, Metasoft, on the same type of care that the company was providing, which was home health care. And on Medicare fraud and abuse. And you can find that actually in the defendants, in Ms. Talaga's own objection to the PSR and in her sentencing memo. There's under Exhibit 1, as well as the government's response to that sentencing memo, which is in Document 265, Exhibits H and I. In addition to that, there was a witness at trial who testified, and that's Ms. Wardsala. When in 2007, she worked with Ms. Talaga, Ms. Talaga told her that she was an experienced biller. And Ms. Wardsala observed her working quickly and expertly and said that if a claim were rejected, Ms. Talaga would just change the billing code to make it look like something else. That's in the transcript at 346 through 350. So there is evidence about her education, about her training, that the district court relied on. The district court also said at sentencing that the numbers just wouldn't work and that Ms. Talaga knew what the numbers of hours were. Now, the district court did not talk about billing 24 hours in a day for a month. What the district court actually said, and this is at the sentencing transcript 29, is that the number of hours that each physician was putting in for care plan oversight was unrealistic. And there's certainly evidence in the record that that was true back in 2007. You can see, and this is government's exhibit 7S, that Ms. Talaga was submitting increasingly incredible volumes of care plan oversight under Dr. Lucero's names. Ranging from almost two full weeks of CPO for the month of August 2007 to, I believe it's August 2007, to three full-time weeks of CPO for the month of April 2008. So this is well before, this is early on in her tenure and at the outset. And so those are the reasons that the district court pointed to. And in addition, there are other facts at trial, such as the testimony of Ms. Wardsola talking about an episode where Ms. Talaga would actually push her out of the way to up-code a bill. And then a September 2008 email where Ms. Talaga talked about blowing in all of the home supervision stuff when she was out of the country and didn't have the paper records to actually review. So those are the facts that demonstrate the district court did not clearly err in reaching its conclusion. And unless the court has any further questions, or any questions, I will yield the rest of my time to the court. Thank you, Mr. Gingras. Anything further, Ms. Brooke? No, Your Honor. Well, thank you very much. The case is taken under advisement, and Mr. Camarena, we appreciate your willingness to accept the appointment in this case. Thank you.